# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER W. KEIFER and RUTH C. KEIFER, husband and wife, and YRC INC., | ) ) ) ) | Civil Action No. 09-1558 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| REINHART FOODSERVICE, LLC; SCOTT MATHENEY; WERNER ENTERPRISES, INC.; and JOEL BALTHAZAR, | ) ) ) ) ) | |
| Defendants. | ) | |
| | ) | |
| SCOTT E. MATHENEY, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JOEL BALTHAZAR and WERNER ENTERPRISES, | ) ) ) | |
| | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

## I.      Introduction

This is a consolidated diversity action arising out of a motor vehicle accident occurring in the early morning hours of April 23, 2008 along the Pennsylvania Turnpike (the "accident"). The claims asserted in this case were tried before a jury, which rendered its verdict on October 19, 2012. (ECF No. 327.) Currently pending before the court are three separate post-trial motions

filed pursuant to Federal Rules of Civil Procedure 50(b), 59 and 60(b). (ECF Nos. 323, 325, 354.)

On September 1, 2009, Peter Keifer ("P. Keifer") and Ruth Keifer ("R. Keifer" or together with P. Keifer, the "Keifers"), husband and wife, commenced this action at case number 09-1187 (the "Keifer case") against Scott Matheney ("Matheney"), Reinhart Food Service, LLC ("Reinhart"), Joel Balthazar ("Balthazar"), and Werner Enterprises, Inc. ("Werner"). P. Keifer, a professional truck driver and employee of Roadway Express – the predecessor of YRC, Inc. ("YRC") – alleged his injuries were caused by the negligent driving of Matheney, a professional truck driver and employee of Reinhart, and Balthazar, a professional truck driver and employee of Werner. The Keifers' claims asserted against Reinhart and Werner were premised on vicarious liability and the negligent failure to train, monitor and supervise their respective drivers who were involved in the accident. (09-CV-1187, ECF No. 1 ¶ 12.) The Keifers sought compensatory and punitive damages from Matheney, Reinhart, Balthazar, and Werner (collectively "defendants"). (Id. at 6.)

On November 24, 2009, Matheney commenced a separate action at case number 09-1558 (the "Matheney case") against Balthazar, Werner, P. Keifer, and YRC, alleging that his injuries were attributable to the negligent driving of Balthazar and P. Keifer. He averred that Werner and YRC were vicariously liable for the actions of Balthazar and P. Keifer, and that Werner was directly liable for permitting Balthazar to operate a tractor-trailer without appropriate training, monitoring, or supervision. (ECF No. 1 ¶¶ 19-20.)

On February 26, 2010, YRC filed a motion to intervene in the Keifer case seeking compensation for the property damage incurred by its predecessor, Roadway Express, and the amount of workers' compensation benefits that Roadway Express paid to P. Keifer. (09-CV-

1187, ECF No. 31 ¶¶ 4-8.) The motion to intervene was granted on March 24, 2010, and the following day YRC filed intervenor complaints in both the Keifer and Matheney cases. (ECF No. 28; 09-CV-1187, ECF Nos. 33, 34.) On April 8, 2010, the court consolidated the cases filed by the Keifers and Matheney at civil action number 09-1558, and the Keifer case was closed.

In a stipulation filed on September 6, 2011, the Keifers withdrew their claims for punitive damages against Balthazar and Werner and all claims relating to Werner's training, monitoring and supervision of Balthazar. (ECF No. 101 ¶ 2.) Balthazar and Werner withdrew their pending motion for partial summary judgment concerning the claims asserted by the Keifers. (Id. ¶ 1.) The Keifers, Balthazar, and Werner stipulated that Balthazar was acting within the scope of his employment at the time of the accident and that Werner was vicariously liable for any torts committed by Balthazar in connection with the accident. (Id. ¶ 3.)

On September 12, 2011, Matheney filed a motion for voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2), seeking to withdraw his claims against P. Keifer and YRC. (ECF No. 102.) On September 16, 2011, the court granted Matheney's motion for voluntary dismissal and dismissed Matheney's claims against P. Keifer and YRC. (ECF No. 108.) In a stipulation filed on September 14, 2011, Matheney withdrew his claims against Werner relating to the training, monitoring and supervision of Balthazar. (ECF No. 103 ¶¶ 2-3.) Balthazar and Werner withdrew their motion for partial summary judgment concerning the claims asserted by Matheney. (Id. ¶ 1.) It was agreed that Balthazar was acting within the scope of his employment at the time of the accident, and that Werner was vicariously liable for Balthazar's conduct in the event that negligence could be established. (Id. ¶ 4.)

The court determined that the jury trial in this matter would be bifurcated. P. Keifer's negligent entrustment claim for punitive damages against Reinhart was to be separately tried

from the other liability and damages issues raised by the parties. (H.T. 9/24/2012 (ECF No. 367) at 36.) On September 24, 2012, a jury trial commenced and all claims remaining between the parties, but for the Keifers' negligent entrustment claim against Reinhart, were tried before a jury.[1] On October 19, 2012, the jury found

> for Scott Matheney ("Matheney") and against Werner Enterprises, Inc. ("Werner") and Joel Balthazar ("Balthazar") with 50% of causal negligence attributable to Matheney and 50% of causal negligence attributable to Werner and Balthazar. Damages sustained by Scott Matheney as a result of the accident, without regard to and without reduction by the percentage of the causal negligence of Matheney, are $182,777.77.

> [and]

> for Peter W. Keifer, Ruth C. Keifer, and YRC, Inc. ("YRC") and against Reinhart Foodservices, LLC ("Reinhart") and Scott Matheney ("Matheney") and Werner Enterprises, Inc. ("Werner") and Joel Balthazar ("Balthazar") with percentage of causal negligence attributable to Reinhart and Matheney 50% and Werner and Balthazar 50%. Damages sustained by Peter W. Keifer as a result of the accident are $892,905.95. Damages sustained by Ruth C. Keifer as a result of the accident are $80,000. Damages sustained by YRC as a result of the accident are $284,552.11.

---

[1] The claims remaining between the parties prior to the commencement of the jury trial were as follows: (1) the Keifers' negligence claim against Balthazar; (2) the Keifers' vicarious liability claim against Werner; (3) the Keifers' negligence claim against Matheney; (4) the Keifers' vicarious liability claim against Reinhart; (5) the Keifers' negligent entrustment claim against Reinhart; (6) Matheney's negligence claim against Balthazar; (7) Matheney's vicarious liability claim against Werner; (8) the cross-claims for contribution or indemnity asserted by Balthazar and Werner against Matheney and Reinhart; (9) the cross-claims for contribution or indemnity asserted by Matheney and Reinhart against Balthazar and Werner; and (10) YRC's intervenor claims against Balthazar, Werner, Matheney and Reinhart. (See ECF No. 122 at 33-34.) The parties agreed that at all times relevant to the accident, Matheney acted as an agent of Reinhart and Balthazar acted as an agent of Werner. It was, therefore, unnecessary to submit the issue of the vicarious liability of Reinhart and Werner to the jury. The liability issues submitted to the jury in phase one of the bifurcated jury trial were limited to the claims for negligence of Matheney and Balthazar in causing P. Keifer's injuries, the contributory negligence of P. Keifer in causing his own injuries, the negligence of Balthazar in causing Matheney's injuries, and the contributory negligence of Matheney in causing his own injuries. (See ECF No. 327.) Prior to closing arguments in phase one of the jury trial, P. Keifer withdrew his claim for negligent entrustment against Reinhart.

(ECF Nos. 320, 321.) The jury's verdict in favor of P. Keifer included an award for future loss of earnings in the amount of $325,000 and future medical expenses in the amount of $45,000. (ECF No. 327 at 5.)

The parties filed several post-trial motions following the conclusion of the jury trial. The court referred the majority of those motions to a special master, and on December 21, 2012, the special master filed a report and recommendation with respect to those motions. (ECF No. 358.) On April 10, 2013, the court issued an order adopting in part the special master's report and recommendation. (ECF No. 364.) Currently pending before the court are three post-trial motions filed by Matheney and Reinhart, Balthazar and Werner, and the Keifers relating to various rulings the court made during the course of trial. (ECF Nos. 323, 325, 354.) These motions were not referred to the special master.

In the post-trial motions filed by Matheney and Reinhart and Balthazar and Werner, the defendants argue the evidence presented at trial was insufficient to support awards for loss of future earnings and future medical expenses in favor of P. Keifer. (ECF Nos. 323, 325.) On November 13, 2012, the Keifers filed a response in opposition to each of those motions. (ECF Nos. 333, 334.) In the post-trial motion and the brief in support of the post-trial motion filed by the Keifers, they argue the court erred in its determination that the evidence presented at trial was insufficient to support an award of punitive damages based upon the vicarious liability of Reinhart for Matheney's outrageous conduct in causing the accident. (ECF Nos. 354, 355.) On December 11, 2012, Matheney and Reinhart filed a response in opposition to the Keifers' post-trial motion. (ECF No. 357.) The court will address each of three post-trial motions relating to the court's rulings during the jury trial below.

## II.     Standards of Review

Matheney, Reinhart, Balthazar, and Werner filed their post-trial motions pursuant to Federal Rules of Civil Procedure 50(b), 59(e), and 60(b). The Keifers filed their post-trial motion pursuant to Rule 59.

Rule 50(b) provides:

> **(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
> > (1) allow judgment on the verdict, if the jury returned a verdict;
> >
> > (2) order a new trial; or
> >
> > (3) direct the entry of judgment as a matter of law.

FED. R. CIV. P. 50(b). Under Rule 50(b), the court must determine "whether 'viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" Eshelman v. Agere Sys., Inc., 554 F.3d 426, 433 (3d Cir. 2009) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)). "Although judgment as a matter of law should be granted sparingly, [the court shall] grant it where 'the record is critically deficient of the minimum quantum of evidence' in support of the verdict." Eshelman, 554 F.3d at 433 (quoting Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083 (3d Cir. 1995)). The Third Circuit Court of Appeals has instructed that "[i]n performing this narrow inquiry, [the court] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting

[its] own version of the facts for that of the jury." <u>Eshelman</u>, 554 F.3d at 433 (quoting <u>Marra v. Phila. House. Auth.</u>, 497 F.3d 283, 300 (3d Cir. 2007)).

In the alternative to their motions filed pursuant to Rule 50(b), Matheney, Reinhart, Balthazar, and Werner seek judgment notwithstanding the verdict pursuant to Rule 59(e). The Keifers generally assert their post-trial motion under Rule 59(a). Rule 59 "addresses motions for a new trial under 59(a) or to alter or amend a judgment under 59(e)." <u>Graboff v. Colleran Firm</u>, Civ. No. 10-17-10, 2013 WL 1286662, at *14 (E.D. Pa. Mar. 28, 2013). Rule 59(a) provides:

**(a) In General.**

**(1) Grounds for New Trial.** The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:

> **(A)** after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

> **(B)** after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

FED. R. CIV. P. 59(a). "A new trial may be granted 'when the verdict is contrary to the great weight of the evidence; that is where a miscarriage of justice would result if the verdict were to stand' or when the court believes the verdict results from jury confusion." <u>Brown v. Nutrition Mgmt. Servs. Co.</u>, 370 F. App'x 267, 268-70 (3d Cir. 2010) (quoting <u>Pryer v. C.O. 3 Slavic</u>, 251 F.3d 448, 453 (3d Cir. 2001)).

With respect to the motions filed pursuant to Rule 59(e) by Matheney and Reinhart and Balthazar and Werner, that rule provides:

**(e) Motion to Alter or Amend a Judgment.** A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

FED. R. CIV. P. 59(e). A motion to alter or amend a judgment, also known as a motion for reconsideration, filed under this rule is ordinarily granted only (1) if there is "an intervening

change in the controlling law," (2) it involves the presentation of "new evidence" that was not available at the time of the ruling in question, or (3) to address the "need to correct a clear error of law or fact or to prevent manifest injustice." Max's Seafood Cafe v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). Similar to motions filed pursuant to Rule 50(b), "'[b]ecause of the courts' interest in the finality of judgments, motions for reconsideration should be granted sparingly.'" Graboff, 2013 WL 1286662, at *15 (quoting Tomasso v. Boeing Co., Civ. No. 03-4220, 2007 WL 2458557, at *2 (E.D. Pa. Aug. 24, 2007)).

Matheney and Reinhart and Balthazar and Werner also assert Rule 60(b) as a basis for their post-trial motions. Rule 60(b) provides:

> **(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > **(1)** mistake, inadvertence, surprise, or excusable neglect;
> >
> > **(2)** newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> >
> > **(3)** fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> >
> > **(4)** the judgment is void;
> >
> > **(5)** the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> >
> > **(6)** any other reason that justifies relief.

FED. R. CIV. P. 60(b).

> The general purpose of Rule 60(b) is "to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice must be done." Boughner v. Sec'y of Health, Educ. and Welfare, 572 F.2d 976, 977 (3d Cir.1978) (citation omitted). "[R]elief from a judgment under Rule 60(b) should be granted only in exceptional circumstances." Id. (citations omitted). Thus, a "Rule 60(b) motion may not be used as a substitute for appeal, and ...

legal error, without more, cannot justify granting a Rule 60(b) motion." Smith v. Evans, 853 F.2d 155, 158 (3d Cir.1988) (citations omitted).

United States v. Gagliardi, Civ. No. 10-480, 2011 WL 1362620, at *1 (E.D. Pa. Apr. 6, 2011).

### III. Discussion

#### A. Loss of Future Earnings (ECF Nos. 323, 325)

The Pennsylvania Supreme Court has held that "[l]oss of future earnings, if proven, is properly included in a damage award." Helpin v. Trustees of Univ. of Pa., 10 A.3d 267, 270 (Pa. 2010). "In practice, estimation of future earnings has been neither straightforward or without controversy."[2] Id.

> Although the plaintiff bears the burden of proving damages by a preponderance of the evidence, he is required only to provide the jury with a reasonable amount of information so as to enable the jury fairly to estimate damages without engaging in speculation. Damages need not be proved with mathematical certainty.

Bolus v. United Penn Bank, 525 A.2d 1215, 1225-26 (Pa. Super. Ct. 1987). "The law does not permit a damages award to be based on mere guesswork or speculation, but rather requires a reasonable basis to support such an award." Id. (citing Kaczkowski v. Bolubasz, 421 A.2d 1027, 1030 (Pa. 2010)). "[L]ost earning capacity involves the question, 'Has the economic horizon of the disabled person been shortened because of the injuries sustained as a result of the tortfeasor's negligence?'" Ruzzi v. Butler Petroleum Co., 588 A.2d 1, 6-7 (Pa. 1991) (quoting Bochar v. J.B. Martin Motors, Inc., 97 A.2d 813, 815 (Pa. 1953)). "The consideration of loss of earning

---

[2] In Shaw v. Sutliff, the court described the competing interests at stake with respect to the fashioning of an award for loss of future earnings:

> To require plaintiff to prove scientifically what his loss of earning power would be would result in a grave injustice to his claim, as such a determination is presently impossible. Fairness to the defendant dictates, however, that the plaintiff prove his injury and offer some evidence to substantiate any possible adverse effect upon his economic horizon.

Shaw v. Sutliff, 8 Phila. Co. Rptr. 379, 393 (Pa. Com. Pl. 1982).

capacity is not solely the comparative amount of money earned before or after an injury. The true test is whether or not there is a loss of earning power, and of ability to earn money[.]" Mazi v. McAnlis, 74 A.2d 108, 112 (Pa. 1950).

"It is settled Pennsylvania law that where there is evidence that a plaintiff has suffered disabling permanent injury, it is a jury question as to whether such injury will 'shorten' his 'economic horizon' and thereby result in a future loss of earning power." Frankel v. Todd, 393 F.2d 435, 438 (3d Cir. 1968). "Loss of earning capacity refers to the disadvantage a plaintiff suffers in competing with uninjured persons in the employment market." Heckman v. Fed. Press Co., 587 F.2d 612, 618 (3d Cir. 1978). The court discerns from the case law that there are three factors to be considered in determining whether sufficient evidence was presented to instruct a jury about whether to award damages for future lost wages. The court must determine whether the evidence provided the jury a reasonable basis to find (1) the existence of a permanent or ongoing injury caused by the defendant; (2) the injury's effect on the plaintiff's earning capacity;[3] and (3) the amount of earnings lost due to the injury. See Gary v. Mankamyer, 403

---

[3] Where it is obvious that an injury impairs a plaintiff's earning capacity, the plaintiff is not required to introduce specific evidence of the injury's impact on his or her employment prospects. Evidence of the extent of the injury and nature of the plaintiff's occupation will suffice. The fact-finder may rely on its common sense and experience to find the plaintiff's injury impairs his or her future earning capacity. See, e.g., Carminati v. Phila., 176 A.2d 440, 443 (Pa. 1962) ("A girl with double vision who must hold her head at a bizarre tilt will have serious difficulty in getting through the barriers which surround most good jobs…. it does not require much reflection or study to conclude that the doors of offices, banks, stores, and factories will probably be closed to Jean for any work which requires the precisional use of her eyes."); Harding v. Consol. Rail Corp., 620 A.2d 1185, 1194 (Pa. Super. Ct. 1993) (Evidence that plaintiff, a trainman, "suffered a total amputation of his left foot and a partial amputation of his right foot as a result of the accident[,]" was "sufficient to submit the question of…lost economic horizons to the jury."). When it is not obvious that an injury will affect the plaintiff's earning capacity, he or she must present evidence demonstrating the injury's impact upon his or her ability to work. See, e.g., Kearns v. Clark, 493 A.2d 1358, 1365 (Pa. Super. Ct. 1985) (finding the evidence was insufficient to support an award of loss of future earnings where plaintiff "made no effort to prove that…[the] loss of a kidney would produce a future loss of earnings.").

A.2d 87, 89 (Pa. 1979); Serhan v. Besteder, 500 A.2d 130, 134-35 (Pa. Super. Ct. 1985); Kearns v. Clark, 493 A.2d 1358, 1364 (Pa. Super. Ct. 1985); Trach v. Thrift Drug, Inc., Civ. No. 1997-C-1535, 2004 WL 5209122 (Pa. Com. Pl. Lehigh Cnty. 2004); Frye v. Kanner, Civ. No. 2364, 1993 WL 1156104, at *187 (Pa. Com. Pl. Phila. Cnty. 1993). The foregoing decisions illustrate the kind of evidence necessary to prove each of the factors to be considered with respect to lost future earnings.

With respect to the first factor, medical evidence is required to prove the permanency of plaintiff's injury. Messer v. Beighley, 187 A.2d 168, 170 (Pa. 1963) (finding insufficient evidence to establish permanency of injury where "plaintiff's only medical witness was never specifically asked, nor did he state that the injury was permanent; reference was only "to the condition as 'chronic' with resulting 'recurrent' episodes of pain"). Proving permanency of injury, however, "is not equivalent to a finding that earning power has been impaired." Carroll v. Pgh. Rys. Co., 187 A.2d 293, 295 (Pa. Super. Ct. 1962). With respect to the second factor, "[t]he 'plaintiff must establish that [her] economic horizon has been shortened.'" Kearns, 493 A.2d at 1364 (quoting O'Malley v. Peerless Petroleum, Inc., 423 A.2d 1251, 1255 (Pa. Super. Ct. 1980)). "There must be some evidence from which a jury can reasonably infer that earning power will probably be reduced or limited in the future." Kearns, 493 A.2d at 1364. Unlike proving the existence of a permanent injury, expert testimony is not required to prove loss of earning capacity; the plaintiff's testimony may be sufficient. Gary, 403 A.2d at 90 (citing Goodhart v. Pa. RR Co., 35 A. 191 (1896)).

With respect to the third factor – the amount of earnings lost due to the injury – "[i]f a plaintiff proves that his or her ability to perform the duties of employment has been impaired, a jury can award damages for loss of future earning power even though the loss has not been

translated by evidence into a precise monetary figure." Kearns, 493 A.2d at 1364. It is sufficient for a plaintiff to provide information to enable the jury "'to estimate damages without engaging in speculation.'" Detterline v. D'Ambrosio's Dodge, Inc., 763 A.2d 935, 941 (Pa. Super. Ct. 2000) (quoting Cohen v. Albert Einstein Med. Ctr., 592 A.2d 720, 729 (Pa. Super. Ct. 1991)). In Detterline, for example, the court found that a wife's testimony with respect to her deceased husband's "education, employment history, relationship with his family, and salary of eight dollars per hour" along with the trial judge's instruction that the husband "could have been expected to live 46.4 more years" was sufficient to support an award for loss of future earnings. Detterline, 763 A.2d at 941.

A plaintiff's recovery for loss of future earnings is not thwarted by the plaintiff returning to work and earning the same amount or even more money than he or she did prior to the defendant's tortious conduct that caused him or her injury. Bochar v. J.B. Martin Motors, Inc., 97 A.2d 813, 815 (Pa. 1953). In Bochar, the Pennsylvania Supreme Court held:

> A tort feasor is not entitled to a reduction in his financial responsibility because, through fortuitous circumstances or unusual application on the part of the injured person, his wages following the accident are as high or even higher than they were prior to the accident. Parity of wages may show lack of impairment of earning power if it confirms other physical data that the injured person has completely recovered from his injuries. Standing alone, however, parity of wages is inconclusive. The office worker who loses a leg has obviously had his earning ability impaired even though he can still sit at a desk and punch a comptometer as vigorously as before. It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tort feasor's negligence? That is the test. And it is no answer to that test to say that there are just as many dollars in the patient's pay envelope now as prior to his accident. The normal status of a healthy person is to progress, and to the extent that his progress has been curtailed, he has suffered a loss which is properly computable in damages.

Id.

In their post-trial motion with respect to loss of future earnings, Balthazar and Werner argue:

> [T]he record in this case is devoid of any evidence that Mr. Keifer was disabled in any way from working at any point subsequent to his return to full duty, full time work as a commercial truck driver in October 2008 or would be disabled at any time thereafter.

(ECF No. 323 ¶ 4.) According to Balthazar and Werner, P. Keifer failed to provide the jury a reasonable basis to award him lost future earnings because he did not present expert medical testimony to establish that his injuries precluded him from performing some function of his job when he returned to work following the April 23, 2008 accident or that they would preclude him from performing his job in the future. (Id. ¶ 10.) Similarly, Matheney and Reinhart argue P. Keifer failed to present evidence sufficient to provide the jury a reasonable basis to award lost future earnings because

> [n]ot only is there no medical expert testimony demonstrating that Mr. Keifer was disabled and would continue to be in the future, the Keifer Plaintiffs, themselves failed to prove that Mr. Keifer sustained lost future earnings because he was able to continue working as a tractor-trailer driver rendering his decision to retire purely voluntary.

(ECF No. 326 at 11.) The arguments made by these defendants are not supported by law and disregard the evidence presented at trial.

As discussed above, to support an award for lost future earnings, the court should consider whether the plaintiff presented evidence with respect to (1) the existence of a permanent or ongoing injury caused by the defendant; (2) the injury's effect on the plaintiff's earning capacity; and (3) the amount of earnings lost due to the injury. Defendants' argument implies expert testimony is required to prove the first two elements, i.e., the injury exists *and* that it affects plaintiff's earning capacity. This argument is not supported by law. Although expert medical testimony *is* required to prove the first element – the plaintiff sustained an injury that

will persist into the future, expert testimony is *not* required to prove the second element – loss of earning capacity due to that injury. Here, P. Keifer presented evidence sufficient to provide the jury a reasonable basis to conclude that his economic horizons were limited due to the injury sustained as a result of the defendants' negligence.

## 1. Permanent injury

With respect to the first factor – proving a permanent injury – P. Keifer presented the testimony of Raymond Drapkin ("Drapkin"), an orthopedic surgeon. (ECF No. 376-2 at 4.) Drapkin testified that he examined P. Keifer on three occasions: July 31, 2009, July 15, 2010, and June 15, 2012. (Id. at 5.) Drapkin testified:

- Among other injuries sustained as a result of the April 23, 2008 accident, P. Keifer suffered a displaced fracture of his femur, fracture around his knee, and fracture of his right wrist. (Id.)

- An x-ray of P. Keifer's right hip revealed that he has posttraumatic arthritis in his right hip as a result of the fracture of his right femur. (Id. at 8.)

- An x-ray of P. Keifer's right wrist "revealed a healed fracture of the distal radius with some narrowing at the wrist joint and shortening of the distal radius[,]" which is consistent with posttraumatic arthritis in his right wrist joint. (Id.)

- "Typically, posttraumatic arthritis will get worse with age and usually will occur sometime after the fracture." (ECF No. 376-2 at 8.)

- The arthritis in P. Keifer's right hip increased and his right leg was "slightly worse" from the July 15, 2010 examination to the June 15, 2012 examination. (Id. at 9.)

- P. Keifer's residuals are permanent (Id.)

Drapkin's testimony is sufficient to provide the jury a reasonable basis to conclude the residuals of P. Keifer's injuries will persist into the future.

## 2. The injury's effect on the plaintiff's earning capacity

With respect to the second factor – the injury's effect on the plaintiff's earning capacity – P. Keifer's testimony established his injuries impaired his earning capacity. Following P.

Keifer's brain surgery on September 2, 2008, he wanted to return to work as a truck driver. (T.T.

10/15/12 (ECF No. 373) at 17.) He testified:

> Well, I like my job. I wanted to get back to work and do what I was hired to do,
> you know. There was only a few of us in that terminal down there at that time,
> and I was part of the team, you know. I wasn't, I wasn't holding up my end, I
> didn't feel. So I figured I needed to get back to work.

(T.T. 10/17/12 (ECF No. 375) at 5.) P. Keifer passed the required physical examinations and

received the necessary certification with respect to his commercial driver's license, and on

October 26, 2008, he returned to work full-time as a tractor trailer driver. (T.T. 10/15/12 (ECF

No. 373) at 17-18, 38.) His job entailed a two-hour drive to work, followed by a six and one-half

to seven-hour drive in the tractor trailer. (Id. at 47.) He was required to be at work by 11:00 p.m.,

at which time he performed his pre-trip inspection. (Id. at 50.) He began his trip in the tractor

trailer when "the load was ready." (Id.) Once he arrived at his destination, he turned in

paperwork, and went to a motel until he was called back to work for the return trip. (Id.) He

stayed at the motel to rest for at least as long as required by the Department of Transportation.

(Id.) Following his rest, he would make the six and one-half to seven-hour drive back to his work

location followed by a two-hour drive home. (Id. at 47-48.) If he began his return trip by 5 p.m.,

he would arrive at his home base by midnight, twenty-four hours after he arrived to work. (Id. at

50, 51.)

P. Keifer's job also consisted of "hooking the trailers." (Id. at 38.) He described "hooking

the trailers" as follows:

> Well, you would have to back the tractor in front of the trailer, get out of the
> truck, hook up the air lines and the electric lines, then back underneath the trailer,
> get out, wind up the landing gear, the dolly wheels, and do your pre-trip.
> …
> There's a crank on the side of the trailer connected to the, the dollies on the
> underneath of the trailer, and it's a cranking mechanism where you have to crank

the dollies up so they don't drag the ground after you put the tractor underneath the trailer.

(Id. at 39.) P. Keifer performed the foregoing tasks throughout the four-year period that he worked following the accident. (Id. at 39, 48.) P. Keifer made three round-trips per week throughout this time. (Id. at 50, 49.)

When P. Keifer returned to work following the accident, "[he] was able to do the job. Not without some pain and some difficulty, but [he] was able to do [his] job as [he] was instructed to do. [He] did [his] duties." (Id. at 22-23.) With respect to any problems he encountered upon returning to work, P. Keifer testified:

> I had to be careful how I stepped on my right leg.  Instead of -- I'm right, right-handed. Instead of leading with my right foot, I led with my left foot when stepping up and down in the truck. I was very easy about putting any -- a lot of weight on the leg. I didn't want to re-injure it. And I had to be -- watch what I, how I grabbed a hold of my, my right wrist. It was still tender.

(T.T. 10/15/12 (ECF No. 373) at 23.) He used his right leg, in which he suffered a broken femur and has posttraumatic arthritis, for the accelerator and brake while driving the tractor trailer. (Id.) He used his right wrist, which was broken as a result of the accident and caused him posttraumatic arthritis, to shift gears in the tractor. (Id.) Following the accident, after a six and one half-hour day driving in the tractor trailer, P. Keifer testified that "[i]t was good to get out of the truck. It was a relief to get out of the truck. It, it was painful, and had to walk the pain out of your leg after, after being in a sitting position." (Id. at 24.) He commented:

> Well, when I first went back, I thought, well, the problems I had with my leg, and the aches and pains when you get out of the truck and got to where you were going, that that would go away in time, and the feelings of anxiety when you're driving down the road, I thought that would dispense. But instead of going away, they got worse.

(T.T. 10/17/12 (ECF No. 375) at 5.) With respect to how his situation worsened, P. Keifer told the jury:

Well, the pain, when you get out of the truck out there when you finished your trip, the only thing I could think about was resting, going to bed, getting out of that truck and getting away from it. And it continued to get worse. And there was an awful lot of stress involved. You know, you got a lot of responsibility when you're driving a truck. It's not like driving your car. You've got 80,000-pounds, and all that weight, you got a responsibility to the motoring public, you got responsibilities to your company and their customers. They want that freight delivered on time, and safe. And you have responsibilities to your family. And all that started to work on me. Maybe I wasn't the driver that I once thought I was. Maybe this accident had taken enough out of me. Maybe I better think about getting away. And I thought about it for a long time.

…

Well, it continued to build. The stress level increased. I kept thinking about what would happen if I got involved in another accident such as this, what would happen to that pin in my leg, would it go up now through my leg and cut my blood vessel, and I would have to lose a leg, or bleed to death. What if I had another brain bleed. All this talk out there about multiple head injuries. What if I get hit in the head again. I become mentally disabled, you know. That all led into it, you know, also.

(Id. at 6-7.)

P. Keifer described his ailments following the accident as follows: "Well, that pin in my leg, that break area, it's, it's painful. If I walk long distances on it -- well, not long distances. If I just walk on it, and if I get in rough terrain, I get -- my leg pains me, yes." (Id. at 24-25.) He told the jury that although his leg still hurts, it has not gotten worse over the past three or four years since he had treatment. (Id. at 42.) Doctors told him there is a possibility that he may need surgery to remove the nail out of his leg. (Id. at 42.) His right wrist "still bothers [him]." (T.T. 10/15/12 (ECF No. 373) at 26.) He described his limitations with respect to his wrist as follows:

I have to be careful what I pick up with my wrist, because I drop things. Just plainly, I don't have good control with my fingers. I just flat out drop things. And I have to watch what I pick up, and just have to watch what I do with my leg. It's, you know, if I overdo it, who knows what's going to happen, you know.

(Id.) P. Keifer told the jury that he has pains in his leg and wrist at the end of every day.[4] (Id. at

---

[4] P. Keifer has constant ringing in his left ear, also known as tinnitus. (T.T. 10/15/12 (ECF No.

30.) This evidence is consistent with Drapkin's testimony that P. Keifer had posttraumatic arthritis in his hip and wrist.

P. Keifer testified that he retired from truck driving on August 1, 2012, four years after returning to work following the accident. (T.T. 9/28/12 (ECF No. 372) at 95.) He was sixty-five years old when he retired. (T.T. 10/15/12 (ECF No. 373) at 27-28.) P. Keifer's decision to stop working was a personal decision. (Id. at 82.) On redirect examination, his counsel questioned him about his decision to retire:

> Q. And I think when Mr. Pion asked you, you said you stopped working for personal reasons. You realized maybe you had to get out. What personal reasons was it that made you stop and had to get out?
>
> A. Well, from the time I went back after the accident, I wasn't -- didn't feel like I was 100 percent, that I could give a hundred percent to the company I worked for. And it was a very, very stressful thing. Driving became a stressful occupation, and –
>
> Q. In what way? What were your fears, or concerns, or stresses when you were driving after your accident?
>
> A. Well, I would overreact to -- well, not overreact, but I see something happening ahead of me, I would get tense, tighten up, and I don't know. Maybe overreact some, I guess.
>
> Q. Were you concerned for your safety and others?
>
> A. Yes.
>
> Q. Because you were a little jumpy?
>
> A. Yes, I was jumpy.

(T.T. 10/15/12 (ECF No. 373) at 92.) P. Keifer explained how he would "overreact:"

---

373) 26-27.) The ringing interferes with his ability to sleep. (Id. at 27.) His family doctor told him there was nothing he could do for the ringing. (Id. at 90.) No expert testimony was presented with respect to the cause of P. Keifer's tinnitus. For this reason, the court cannot consider the tinnitus as a basis to support an award for loss of future earnings.

Well, if I saw somebody pulling out in front of me, even though I was far enough back, I'd get very tense and slow down, you know, or move to the left, get out of the way. But it became a, you know, you would see them and you would, oh, what's going on here, you know.

(Id.) His injuries played a role in his decision to retire:

Well, well, yes, it all -- it fed into it, naturally. And well, I recently found out about my hip. I didn't even realize all that. So, all this coming together, that my injuries to my leg and my wrist, and the head injuries all compounded to me that maybe I ought to put this trucking aside and do what I can do.

(T.T. 10/17/12 (ECF No. 375) at 7-8.) Despite the difficulties, P. Keifer wanted to continue

working, but "need[ed] to get out, needed to quit." (T.T. 10/15/12 (ECF No. 373) at 82-83.) He

testified that "[he] had a good job. Paid good, had good benefits, and [he] thought maybe

working along 'til 70, as long as [he] could pass [his] physical." (Id. at 91.) P. Keifer told the jury

he is the sole support for the seven people living in his home, which his wife, their daughter, her

two children, his son, his son's daughter, and himself. (Id. at 28.) His financial situation made his

decision to retire difficult:

I mean, this was not an easy decision for me, because I've given up my benefits for my wife and I, and an income that we needed to raise all these grandkids around. Now I got to buy my insurance, and my Social Security doesn't really kick in yet. I haven't gotten it yet. I've applied and everything. And my pensions -- are [sic] they have been frozen since, um, 2010, I think they froze them and stopped making contributions to them. So my income has taken quite a hit. So, this was not a light decision that I made. I just didn't feel like the quality of life was there, that with me driving, you would get out of the truck and you wanted to go to bed. So it seemed like all I was doing was working and sleeping, and that's not a very good way to live, you know.

(T.T. 10/17/12 (ECF No. 375) at 7-8.)

P. Keifer still likes to drive. (T.T. 10/15/12 (ECF No. 373) at 36.) He would like to still

be back at work. (Id. at 93.) He explained: "There's a certain amount of relaxation in the truck. I

mean, you know, you know, you get away from it all for a little bit." Id. He would make more

money to support his family if he was still driving a tractor trailer. (Id. at 93-94.) P. Keifer told

the jury his employer did not have a mandatory retirement age and that he knew people who worked into their seventies, including his brother who is seventy years old. (Id. at 102.)

In light of Drapkin's testimony that the residual effects of P. Keifer's injuries were permanent and the posttraumatic arthritis in his right leg had worsened and P. Keifer's testimony with respect to the tasks he was required to perform as part of his job and how the pain in his right leg and right arm affected him, the jury had a reasonable basis to conclude the injuries sustained by P. Keifer as a result of the defendants' negligence shortened his economic horizon. Matheney and Reinhart argue, however, that P. Keifer "failed to prove that [he] sustained lost future earnings because he was able to continue working as a tractor-trailer driver rendering his decision to retire purely voluntary." (ECF No. 326 at 11.) Matheney and Reinhart cite Massman v. Philadelphia, 241 A.2d 921, 925 (Pa. 1968) (per curiam) in support of this argument. (ECF No. 326 at 11.)

In Massman, the plaintiff "suffered an intertrochanteric fracture of the right hip" when her "flat heel…caught in a piece of irregular, broken cement, causing her to fall" while walking in the courtyard of City Hall in Philadelphia, Pennsylvania. Massman, 241 A.2d at 922. Following a nonjury trial, the plaintiff was awarded $16,000 in damages. Id. The plaintiff filed a "Motion for New Trial on the Ground of Inadequacy of the Verdict" arguing she suffered $67,000 in loss of future earnings. Id. at 922, 925. The plaintiff arrived at this figure "by taking the total wages [she] would have earned had she worked until her mandatory retirement age of seventy, and discounting that figure by six percent." Id. The court rejected this figure finding the "[p]laintiff is not entitled to compensation merely because she retired prior to the mandatory requirement age." Id. The court explained:

> It is plaintiff's burden to prove that the accident so impaired her ability to work that retirement was a necessary result of the accident.

Plaintiff testified that as a result of the accident, she had difficulty walking and standing up and sitting down, and that she was always afraid of falling. However, her status as a payroll supervisor did not require physical movement. Hers was a desk job; whatever physical activity she might desire to undertake could have been adequately performed by any of the twenty employees directly under her supervision. During the almost three months that she returned to work following the accident, there were no complaints about her work, and plaintiff failed to show that her performance was in any way inadequate.

Id. The court relied upon plaintiff's financial solvency to conclude her retirement was not caused by the defendant's negligence, noting:

We deem it significant that plaintiff was sixty-one years old when she returned to work, and had spent forty-three years working for John Wanamaker's. Furthermore, by April of 1962, plaintiff was irrevocably entitled to a pension of $161.00 per month plus Social Security, and was unmarried. In view of the financial ease with which plaintiff could retire, her record of forty-three years of work, and her failure to show a diminution in her level of performance on the job, we conclude that plaintiff's retirement was not necessitated by her injuries but was the result of the inconvenience of continuing in a job which, perhaps due to her injuries, was no longer as enjoyable as before.

Id. Matheny and Reinhart argue that similar to the evidence in Massman, the evidence in this case shows P. Keifer retired voluntarily out of convenience. (ECF No. 326 at 13.) They argue "[n]o expert testified that Mr. Keifer sustained a permanent disability or had to retire due to his injuries and no witness has testified that Mr. Keifer was unable to perform his essential job functions as a tractor-trailer driver." (Id.)

Matheney and Reinhart overstate the law with respect to what a plaintiff must show to support a claim for loss of future earnings and Massman is distinguishable from this case. First, as discussed above, expert testimony is not required to prove the injury sustained shortened the plaintiff's economic horizons. P. Keifer testified he used his right leg and right wrist, both of which cause him pain and have posttraumatic arthritis, to drive his tractor trailer for up to fourteen hours in a twenty-four hour period. He told the jury that he was in pain while sitting in

the tractor trailer and while walking on his right leg, and he did not have control of his fingers. This testimony, along with evidence that P. Keifer had difficulties at work, was not "100 percent," and his right leg was worsening, is sufficient to provide the jury a reasonable basis that his broken bones, head trauma, and the permanent residual effects of those injuries shortened his economic horizons as a truck driver – a job which required him to be away from his home for twenty-four hours at a time three times per week.

Unlike the plaintiff's job in <u>Massman</u>, i.e., a payroll supervisor, P. Keifer's job required physical movement; it was not a desk job. There was no evidence to suggest a co-worker could help him perform his physical duties. P. Keifer's job required him to be out on the road away from home for significant periods of time operating an 80,000-pound tractor trailer throughout the night. Although he passed the physical examinations required by his profession, his testimony provided a reasonable basis for the jury to conclude that the residual effects of the injuries sustained as a result of defendants' negligence, i.e., the pain in his right wrist and right leg, shortened his economic horizons. Even more telling, unlike <u>Massman</u>, there is evidence in this case that P. Keifer did not want to retire, liked his job, and had a family of seven people to support. He testified that he would have made more money if he continued working, but he "needed to get out." (T.T. 10/15/12 (ECF No. 373) at 82-83.) This is not a case like <u>Massman</u> where the evidence shows the plaintiff retired because she no longer enjoyed her job. There was sufficient evidence for the jury to find, based upon P. Keifer's testimony, that he enjoyed his job and retired due to the pain and difficulty he was experiencing as a result of the accident.

### 3. The amount of earnings lost due to the injury

With respect to the third factor – amount of earnings lost due to the injury – defendants do not contest the sufficiency of the evidence to provide the jury a reasonable basis to find

$325,000 is the amount of lost future earnings attributable to this accident.[5]

P. Keifer presented a reasonable basis for the jury to conclude he sustained a permanent injury that shortened his economic horizons in the amount of $325,000. Under those circumstances, defendants' post-trial motions with respect to the award for loss of future earnings of $325,000 must be denied.

**B. Future Medical Expenses** (ECF Nos. 323, 325)

"In the context of a claim for future medical expenses, the movant must prove, by expert testimony, not only that future medical expenses will be incurred, but also the reasonable estimated cost of such services." Mendralla v. Weaver Corp., 703 A.2d 480, 485 (Pa. Super. Ct. 1997) (citing Cohen, 592 A.2d at 729). "Because the estimated cost of future medical services is not within the layperson's general knowledge, the requirement of such testimony eliminates the prospect that the jury's award will be speculative." Mendrella, 703 A.2d at 485. The plaintiff, however, is not required to produce expert testimony with respect to the cost of future medical care when he or she introduces evidence of the cost of his or her past medical care. Rogers v. Phila. & Reading Ry. Co., 106 A. 734, 736 (Pa. 1919); Pratt v. Stein, 444 A.2d 674, 697 (Pa. Super. Ct. 1982); Smith v. Putter, Civ. No. 00-2176, 2005 WL 5177291 (Pa. Com. Pl. Feb. 11, 2005). This exception only applies when there is a reasonable basis for the jury to conclude that medical care rendered in the future will cost the same as the medical care rendered in the past, such as when the medical care deemed to be necessary in the future is the same as the medical

---

[5] P. Keifer made in the "70,000-dollar range" as a truck driver. (T.T. 10/15/12 (ECF No. 373) at 18.) With respect to how long he intended to continue to work as a truck driver, he testified: "Well, I had a good job. Paid good, had good benefits, and I thought maybe working along 'til 70, as long as I could pass my physical." (Id. at 91.) P. Keifer's employer did not have a mandatory retirement age, and he knew people who worked into their seventies, including his brother who is seventy years old. (Id. at 102.)

care rendered in the past. See Dillow v. Myers, 78 Pa. D. & C. 4th 225, 244-45 (Pa. Ct. Com. Pl. Carbon Cnty. 2005) (finding a jury would have to speculate with respect to the plaintiff's future medical expenses because he "failed to present any expert opinion about the estimated duration or frequency of future episodes of acute pain requiring treatment, that they would be the same or similar to that required in the past, or that the level of care or costs of future medical expenses for this treatment would approximate those which had occurred in the past."). In other words, even under the exception to the general rule requiring expert testimony, the plaintiff must introduce evidence of the reasonable estimated cost of such services to preclude the jury from making an award based upon speculation or guesswork.

Here, there was a reasonable basis for the jury to conclude P. Keifer was in need of future medical services. Drapkin testified that "[he] believed [Keifer is] at an increased risk for future surgery only with respect to his right leg, not for his right wrist or his abdomen." (ECF No. 323-1 at 10.) Drapkin did not testify about the kind of surgery that P. Keifer is at risk to have in the future or that he would need medical care other than surgery to his right leg. P. Keifer testified that doctors told him "[he] may have to have that nail taken out of [his] leg, possibly." (T.T. 10/15/12 (ECF No. 373) at 42.) P. Keifer's testimony, however, is not sufficient to prove the kind of surgery he will have on his right leg because expert testimony is required to prove what medical care will be needed in the future. Although Drapkin's testimony alone is sufficient to provide the jury a reasonable basis to conclude P. Keifer is at an increased risk for future surgery on his right leg, P. Keifer did not set forth evidence sufficient to provide the jury a reasonable basis to determine the kind of surgery or its cost.

Drapkin did not testify with respect to how much the future surgery would cost. As noted, as a general rule, a plaintiff must present expert testimony with respect to how much those

services will cost. There is an exception to the requirement of expert testimony with respect to the cost of future medical care if the jury has some other reasonable basis to conclude what the cost of the care will be. P. Keifer argues "the jury had all of the bills for the insertion of the hardware in the right leg, the therapy for that leg, and the post-operative visits including radiographs and therefore sufficient ability to estimate future expenses over the life expectancy of the plaintiff." (ECF No. 335 at 11.) P. Keifer is correct that *voluminous* itemized medical bills were submitted to the jury. Those itemized bills, however, were never explained to the jury and there was no testimony explaining how those bills, which totaled $261,123.67 and were for numerous surgeries, physical therapy, and other medical care, related to the surgery needed on P. Keifer's right leg in the future.

Contrary to P. Keifer's argument, even if the jury could parse through the medical bills and identify which ones related to the surgery on his right leg, the jury could not reasonably rely upon the cost of the surgery to insert the nail into P. Keifer's right leg to determine the kind of surgery needed in the future or the cost of such future surgery. There was no expert testimony that the surgery P. Keifer required in the future would be to remove the nail from his leg. There was no testimony suggesting the cost of the surgery on his right leg in the future would be similar to the cost of the past surgery inserting the nail into his right leg. Without this kind of testimony, the jury was left to speculate about the kind of future surgery needed on P. Keifer's right leg and the related costs for the surgery. Under those circumstances, P. Keifer failed to present to the jury a reasonable basis to determine the kind of future surgery needed and the cost of future surgery on his right leg.

The decisions relied upon by P. Keifer support the court's conclusion that the submission of voluminous medical bills to the jury without any explanation that the kind of surgery needed

in the future was the same as or similar to the surgery reflected in the medical bills did not provide the jury a reasonable basis to determine the cost of P. Keifer's future medical care. In Rogers, the Supreme Court of Pennsylvania held:

> "Where the evidence in a personal injury action shows the value of medical services already rendered the injured person, and that **such service** will be required in the future, the jury may determine from the past service and its value, what may reasonably be required in the future, although there is no other evidence of the value of the future services."

Rogers, 106 A. at 736 (quoting Scurlock v. Boone, 121 N.W. 369, 371-72 (Iowa 1909)). This quote from the Pennsylvania Supreme Court's decision in Rogers indicates that the medical services necessary in the future must bear some relationship to the medical services rendered in the past. Courts applying the holding in Rogers have found medical bills provide the jury a reasonable basis to find the cost of future medical services when the medical services rendered in the past are similar to or the same as the medical services predicted to be necessary in the future. See e.g. Pratt, 444 A.2d at 697; Smith, 2005 WL 5177291.

In Pratt, the court concluded there was a reasonable basis for the jury to award damages for future medical care. The court explained:

> Appellee established that he was treated by Dr. DePativo, a chiropractor, from 1973 until May of 1977. Appellee visited Dr. DePativo's office during this period on at least one-hundred-twenty (120) separate occasions at a cost of six dollars ($6.00) per visit. (N.T. 2323). Dr. DePativo testified that said treatment was necessary to alleviate muscle spasms in appellee's neck and back, which spasms he attributed to appellee's constant use of canes. (N.T. 2324). By virtue of the permanent nature of his disability, appellee will necessarily continue to use crutches or canes in the future. Thus, the jury could reasonably have inferred that appellee would require chiropractic treatment with the same frequency as he had in the past. Given the cost for appellee's past chiropractic treatment and the probable number of visits he will require in the future, there was ample evidence from which the jury could have determined appellee's probable future medical expenses and, therefore, the court's charge on that issue was appropriate.

Pratt, 444 A.2d at 697. Like in Pratt, the court in Smith concluded the plaintiff's past medical

bills with respect to his hip surgery provided the jury a reasonable basis upon which to find the

cost of a future hip surgery. The court noted:

> An instruction to the jury is correct where the Plaintiff has established a permanent injury, the need for future care, and the cost of the care that will be necessary. Rogers v. Philadelphia & R.Ry.Co., 106 A. 734, 736 (Pa. 1919); Pratt v. Stein, 444 A.2d 674,697-698 (Pa. Super. 1982). This is true even if the future cost is established by evidence of the expenses caused by the medical care he has already received. Id. The cost of a future hip replacement was established by stipulation of the parties, which was based upon the medical bills and expenses for the first hip replacement. Further, the fact that the Plaintiff would need a future surgery, if not more than one, was testified to by three experts including the Defendant's expert.

Smith, 2005 WL 5177291.

As illustrated by Pratt and Smith, to be entitled to an award for future medical expenses

where the cost of future medical care is proven by past medical bills, the plaintiff must establish

a connection between the medical bills incurred in the past and the medical bills predicted to be

incurred in the future. This connection may be made by evidence that the medical care necessary

in the past is the same or similar to the medical care necessitated in the future. Without this

information, the jury is left to speculate that the cost of past medical procedures is the same or

similar to future medical procedures. This point is illustrated in Dillow. In Dillow, the plaintiff

requested a jury instruction with respect to future medical damages and how they should be

calculated. Dillow, 78 Pa. D. & C.4th at 242.

> [P]laintiff contended that it was appropriate to average the costs of Dr. Kraynak's treatment and the chiropractic and emergency room treatment over the two and a half year period between May 9, 2002 and the date of trial ( i.e., $3,077.48) and then extrapolate this figure for the balance of plaintiff's life. Plaintiff's counsel proposed making this calculation in his closing argument. (N.T., vol. IV, p. 181; vol. V, p. 24.)

Id. (footnote omitted). The court rejected the plaintiff's suggestion, noting

> plaintiff failed to present any expert opinion about the estimated duration or frequency of future episodes of acute pain requiring treatment, that they would be

the same or similar to that required in the past, or that the level of care or costs of future medical expenses for this treatment would approximate those which had occurred in the past. Without this information, to have permitted plaintiff's counsel to average and extrapolate past expenses incurred during an arbitrary time period into an estimate of future costs would have permitted counsel to engage in self-serving speculation and conjecture, which is the antithesis of the requisite degree of probability on which damages must be fairly and intelligently based.

Id. at 244-25. The court concluded that the plaintiff's evidence with respect to the future medical damages was insufficient commenting "[t]hese are not matters of common knowledge, nor was the information provided to the jury on past treatments sufficient for a layperson to make such inferences about future treatment." Id. at 243 (citing Pratt, 444 A.2d at 698).

Here, similar to the plaintiff in Dillow and unlike the appellee in Pratt and the plaintiff in Smith, P. Keifer did not present evidence that the care he received in the past is expected to be the same or similar to the care predicted to be necessary in the future. The kind of care needed in the future is not a matter within common knowledge. Dillow, 78 Pa. D. & C.4th at 242. There was testimony that P. Keifer had surgery to repair his right leg in the past, but there was no expert testimony with respect to the kind of surgery he was at increased risk of having in the future. There was no testimony with respect to which of P. Keifer's voluminous past medical bills compared to what he could expect to be charged in the future. Submitting the entirety of P. Keifer's medical bills to the jury did not provide it with a reasonable basis to award damages for the cost of future medical care. Accordingly, the court will strike the jury's award for $45,000 in favor of P. Keifer for future medical damages. That award is not supported by the evidence presented at trial.

### C. Punitive Damages (ECF No. 354)

The law with respect to punitive damages is well-settled in Pennsylvania.

Punitive damages will lie only in cases of outrageous behavior, where defendant's egregious conduct shows either an evil motive or reckless indifference to the

rights of others. Punitive damages are appropriate when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct. J.J. DeLuca Co., Inc. v. Toll Naval Associates, ‒‒‒ Pa.Super. ‒‒‒, 56 A.3d 402 (2012) (citation omitted).

Outrageous conduct is an "act done with a bad motive or with a reckless indifference to the interests of others." "Reckless indifference to the interests of others", or as it is sometimes referred to, "wanton misconduct", means that "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." Smith v. Brown, 283 Pa.Super. 116, 423 A.2d 743, 745 (1980) (citations omitted).

[I]n Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. Snead v. Soc'y for Prevention of Cruelty to Animals of Pennsylvania, 929 A.2d 1169, 1184–85 (Pa.Super.2007), aff'd, 604 Pa. 166, 985 A.2d 909 (2009) ( citing Hutchison ex rel. Hutchison v. Luddy, 896 A.2d 1260, 1266 (Pa.Super.2006)).

Weston v. Northampton Personal Care, Inc., 62 A.3d 947, 961 (Pa. Super. Ct. 2013). In this case, there was no evidence presented at trial that Matheney had a subjective appreciation of the risk of harm to which P. Keifer was exposed or that Matheney acted or failed to act in conscious disregard of that risk. The Keifers' post-trial motion with respect to punitive damages will, therefore, be denied.

In the Keifers' post-trial motion pursuant to Federal Rule of Civil Procedure 59, they argue the court erred in its determination that the evidence presented at trial did not support a finding that Matheney was reckless and, therefore, the Keifers were entitled to an instruction on punitive damages. (ECF No. 354 ¶ 10.) The Keifers identify evidence admitted and evidence that *should have been admitted* into the record to support their argument that they met their burden to prove Matheney's conduct warranted the issue of punitive damages to go to the jury. In response, Matheney and Reinhart argue that under Pennsylvania law, the court's determination that there was insufficient evidence to support an award of punitive damages was correct because of "the

complete absence of any evidence to suggest that Scott Matheney acted willfully, wantonly, or was recklessly indifferent to the rights of the plaintiffs." (ECF No. 357 at 3.)

The Keifers sought to recover punitive damages from Reinhart based upon two theories – negligent entrustment (direct liability) and vicarious liability (indirect liability). (See T.T. 10/16/12 (ECF No. 374) at 162.) Prior to closing arguments, the Keifers withdrew their claim for negligent entrustment against Reinhart. The court held that whether the Keifers were entitled to punitive damages from Reinhart based upon vicarious liability depended upon whether they presented evidence sufficient to warrant punitive damages against Matheney. The court's determination in this regard was based upon Reinhart's admission that at all times relevant to the accident, Matheney acted as its agent. (T.T. 10/16/12 (ECF No. 374) at 161.) On October 16, 2012, prior to the parties' closing arguments, the court concluded that the evidence did not support a finding that Matheney's conduct was outrageous, and, therefore, if the jury found in the Keifers' favor, they were not entitled to punitive damages from Reinhart based upon a theory of vicarious liability. (Id. at 162.) The Keifers noted their objection to the court's determination on the record. (Id.)

The Keifers argue the court erred in not admitting Matheney's prior driving records, logs, and violation history into evidence to support their argument that Matheney acted outrageously on the night of the accident. Prior to trial, Matheney and Reinhart filed a motion in limine seeking to exclude from evidence Matheney's prior driving records, logs, and violation history. (ECF No. 158.) This evidence included, among other things, Matheny paying a fine for carrying a radar detector while operating a commercial motor vehicle and a citation issued more than a month prior to the accident for operating a commercial motor vehicle while ill or fatigued. The court referred the motions in limine, among others, to a special master. The court adopted the

special master's report and recommendation with respect to Matheney's prior driving records, logs, and violation history and granted the motions in limine. The special master recommended that Matheney's prior driving records, logs, and violation history constituted impermissible character evidence under Federal Rule of Evidence 404(b)[6] and should be excluded from evidence on that basis. The court adopted the special master's reasoning while noting that Matheney's prior driving records, logs, and violation history may be admissible during the second phase of the trial with respect to the Keifers' negligent entrustment claim for punitive damages against Reinhart, which the Keifers subsequently waived at trial.

To the extent the Keifers argue the citation issued more than a month prior to the accident for operating a commercial motor vehicle while ill or fatigued is probative of Matheney's subjective appreciation of the risk of harm to P. Keifer, the court concluded prior to closing arguments that the probative value of this one-time violation was tenuous at best. The court noted:

> The problem you have is, somebody can be fatigued, and you can get -- you can be pulled over by the police. You, you could have had a bad night's sleep. You could have broken up with his girlfriend. He could have been partying the night before. Who knows what it was. So one time, I don't know makes the case for punitives.

---

[6] Federal Rule of Evidence 404(b) provides:

**(b) Crimes, Wrongs, or Other Acts.**

**(1)     Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

FED. R. EVID. 404(b).

(T.T. 10/16/12 (ECF No. 374) at 160.) The court does not find reason to depart from its decision with respect to Matheney's prior driving records, logs, and violation history. There was no testimony that Matheney was in fact fatigued at the time of the accident. The Keifers sought to admit this evidence to show Matheney acted in conformity with his prior bad acts. The evidence is clearly inadmissible under Rule 404(b). The evidence offered by the Keifers to show Matheney had a subjective appreciation of the risk presented by driving his tractor trailer while fatigued, i.e., a one-time violation more than a month prior to the accident, is not sufficiently probative with respect to his conduct on the night of the accident and is substantially outweighed by the danger of unfair prejudice created by presenting the evidence to the jury. Evidence of the violation was correctly excluded from the record under Federal Rule of Evidence 403[7] on that basis. The Keifers are not entitled to a new trial with respect to punitive damages based upon the exclusion of Matheney's prior driving records, logs, and violation history from evidence during phase one of the jury trial in this case.

The Keifers suggest that along with the evidence with respect to Matheney's prior driving records, logs, and violation history, the following evidence, which was admitted into the record at trial, provided the jury a reasonable basis to conclude Matheney acted outrageously on the night of the accident:

- Matheney admitted he never saw an illuminated tractor trailer in front of him.

- Thomas Rubino ("Rubino"), a Pennsylvania State Police trooper, testified that Matheny was not watching the road because he was inattentive, distracted or fatigued.

---

[7] Federal Rule of Evidence 403 provides:
> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

FED. R. EVID. 403.

- At the time of the accident, Matheney was at the end of a double run, having worked more than ten hours before the accident occurred.

- Matheney rear-ended Balthazar's tractor trailer at the maximum speed limit despite the fact he was pulling two fully loaded double tractor trailers. Matheney admitted that he never reduced his speed for such conditions as he was trained to do.

- Matheney had a radar detector in his vehicle.

(ECF No. 355 at 2, 4.)

The Keifers argue Matheney's admission that he never saw Balthazar's illuminated tractor trailer in front of him supports a reasonable jury finding that his conduct was outrageous. Rubino, the primary lead investigator of the accident in this case, testified that Matheney did not see Balthazar's tractor trailer because he was either "inattentive, distracted or fatigued," but did not testify that he could conclude which category in fact applied to Matheney at the time he caused the accident. (T.T. 9/25/12 (ECF No. 369) at 59, 120.) Matheney never told Rubino what "he looked up from[,]" and Matheney never indicated why he did not see Balthazar's tractor trailer until it was directly in front of him. (T.T. 9/25/12 (ECF No. 369) at 84.) Rubino did not know how far back Matheney was from Balthazar when Balthazar pulled onto the roadway or how long it took for Balthazar to pull onto the roadway. (Id. at 114, 150-51.) Rubino told the jury he did not know of anything that distracted Matheney or how long Matheney looked away from the road ahead of him before he "looked up" and saw Balthazar's tractor trailer. (Id. at 144, 148.) In support of the theory that Matheney may have been fatigued while driving, Rubino testified that when a driver falls asleep while driving

> they usually continue going straight. A lot of times when you have an accident and they go off the highway in a curve and don't brake, it's pretty evident what happened. They just go right through the guardrail, if it's -- gradually hit the berm and through the guardrail, knock them down, 20 posts or so and continue through,

if it's a truck driver. Obviously, a car is not going to do that. So they generally go straight.

(T.T. 9/25/12 (ECF No. 369) at 145.) Matheney's path of travel was consistent with this observation and the middle front of Matheney's tractor trailer impacted the middle back of Balthazar's tractor trailer. (Id. at 143, 145.)

Matheney, however, testified that the day before the accident, he arrived home from work around 6:30 a.m. and slept from approximately 7:30 a.m. to 4:00 p.m. (T.T. 9/26/12 (ECF No. 371) at 20-21.) Despite Rubino's testimony suggesting that Matheney may have been asleep prior to his tractor trailer impacting Balthazar's tractor trailer, there was no evidence to suggest that Matheney had a subjective appreciation of the risk that he may fall asleep while driving that night. With respect to Matheney working more than ten hours on the night of the accident, Henry Allan Daley, a driving trainer for Reinhart, testified federal regulations permit drivers to drive up to eleven hours per day. (T.T. 9/26/13 (ECF No. 370) at 88.) Matheney working *up to ten hours* prior to the accident is not, therefore, probative of his subjective appreciation that he was placing P. Keifer at risk by driving that night. There was also no evidence presented to provide the jury a reasonable basis upon which to find the reason Matheney was distracted or inattentive. Accordingly, there was no evidence to support a finding that Matheney had a subjective appreciation of the risk of harm caused by his actions. Under those circumstances, the evidence supported the jury's finding of negligence, but the evidence that Matheney was not watching the road and was approaching his eleventh hour of work is not a sufficient basis for the jury to conclude without speculation that Matheney acted outrageously on the night in question.

The Keifers argue that Matheney's conduct in rear-ending Balthazar's tractor trailer at the maximum speed limit also supports a finding of outrageous conduct entitling them to punitive damages. This evidence, like the evidence discussed above, supports a finding of negligence, but

does not support a finding that Matheney acted in an outrageous manner. First, driving the maximum speed limit is not in and of itself outrageous conduct because even the *maximum* speed limit is *within* the speed limit and the evidence is insufficient to suggest Matheney had a subjective appreciation that driving within the speed limit placed P. Keifer at risk of harm. The Keifers argue that according to Matheney's training, in light of Balthazar pulling out in front of him, Matheney should have applied the brake and slowed down because he was driving two fully loaded double tractor trailers. Matheney's uncontradicted testimony, however, was that by the time he saw Balthazar's tractor trailer, he did not have time to apply the brake before crashing into it. Under those circumstances, the evidence does not support the conclusion that Matheney had a subjective appreciation of the risk of harm caused by traveling sixty-five miles per hour, which was within the posted speed limit.

With respect to Matheney having a radar detector in his vehicle, this evidence is not probative of Matheney acting outrageously on the night of the accident. There is a stark difference between *possessing* a radar detector in a vehicle and *using* a radar detector in a vehicle. Matheney testified that he *possessed* a radar detector in his vehicle at the time of the accident. (T.T. 9/27/12 (ECF No. 371) at 21.) There was no testimony that the radar detector was in *use* at the time of the accident, and P. Keifer does not argue that Matheney used the radar detector the night of the accident to drive at an excessive speed and avoid detection by law enforcement. The evidence presented was that the speedometer in Matheney's vehicle was frozen at sixty-four or sixty-five miles per hour; Matheney's vehicle was governed at 66 miles per hour while the cruise control was in use; and when the cruise control was not in use, the tractor trailer was governed at 68 miles per hour. (T.T. 9/26/12 (ECF No. 370) at 21; T.T. 9/27/12 (ECF No. 371) at 35-36.) In light of the foregoing evidence, Matheney's possession of a

radar detector in his tractor trailer at the time of the accident does not support a finding that he acted outrageously with a subjective appreciation that his conduct caused a risk of harm to P. Keifer; indeed, there was a lack of evidence with respect to how Matheney possessing a radar detector had any impact on the accident and P. Keifer's resulting injuries.

The Keifers cite a number of decisions in support of their argument that the court erred by not submitting the issue of punitive damages to the jury. Those decisions are distinguishable from the present case. In Burke v. TransAm Trucking, Inc., 605 F.Supp.2d 647, 655 (M.D. Pa. 2009), the court denied the defendant trucking company's motion for partial summary judgment with respect to the plaintiff's claim for punitive damages. The court held there was a genuine dispute of material fact with respect to whether the defendant truck driver was speeding prior to the accident and whether the accident occurred near a blind corner. Id. The court explained: "It would not be unreasonable for a jury to find that Defendant Wirfel, with his experience and training, consciously appreciated the risk of harm from driving fifty-five miles per hour in a thirty-five mile per hour zone around a curve and consciously disregarded or was indifferent to that risk." Id.

In Paone v. Lipuma, Civ. No. 04-970, 2006 WL 5186524, at *2 (M.D. Pa. Feb. 1, 2006), the defendant truck driver collided with a vehicle in front of him when he attempted to switch lanes in traffic. The truck driver "admitted to the officer that he was following too closely and was traveling at a speed too fast for the conditions to allow proper control of his vehicle." Id. at *1. Based upon this admission, the court found there was a genuine dispute of material fact with respect to whether the plaintiff was entitled to punitive damages. Id. at *3. Despite the admission and denial of summary judgment, the court noted the plaintiff's claim for punitive damages was "rather tenuous." Id.

In contrast to Burke and Paone, there was no evidence in this case that Matheney had a subjective appreciation of the risk of harm caused by his actions. In Burke and Paone, the courts concluded the evidence supported a finding that the truck driver knew his actions placed other in risk of harm. In Burke, the evidence supported a finding that the truck driver was speeding around a blind curve twenty miles over the speed limit. In Paone, the truck driver admitted he was following the cars ahead of him too closely and was driving too fast in light of the traffic around him. As truck drivers, the defendants in those cases would subjectively know their actions caused a risk of harm to those around them. In this case, there is no evidence to support a jury finding that Matheney was conscious of his conduct, which placed others in risk of harm. The evidence is that Matheney was looking down for an unknown period of time and when he looked up, Balthazar's vehicle was too close for him to be able to apply the brakes. This evidence supported the jury's finding that Matheney was negligent in that he breached a duty of care owed to P. Keifer, but it is not sufficient to find Matheney knew he did something that placed P. Keifer in risk of harm yet proceeded with those actions in conscious disregard of that risk.

Came v. Micou, Civ. No. 04-1207, 2005 WL 1500978, at *5 (M.D. Pa. June 23, 2005) is also distinguishable from the present case. In Came, the plaintiff alleged the defendant truck driver violated six different provisions of the Federal Motor Carrier Act when he caused the accident resulting in her injuries. Id. The plaintiff submitted an expert liability report prepared by the SALT Institute with respect those violations. Id. The court found that based upon the SALT report,

> a reasonable jury could conclude that: logging more than seventy hours during an eight-day period; operating the Decker rig when he was too tired to do so safely as evidenced by Micou's initial statement on a company accident form that he "momentary [sic] blanked out," his inability to make a decision relative to taking

steps to avoid colliding with a slower moving vehicle traveling ahead of his vehicle, his inability to perceive the passage of time from the point when he realized the vehicle ahead was moving slowly to when he collided with the rear of it, and his failure to disengage the cruise control on a vehicle with which he was familiar; combined with falsifying his logs, all in violation of Department of Transportation safety regulations constitutes "reckless indifference to the rights of others."

Id. The plaintiff also submitted an expert report by a driver fatigue expert, who concluded that the truck driver "momentarily fell asleep with a microsleep (sleep lapse) just prior to the collision." Id. The driver fatigue expert opined:

"It is my professional opinion that Mr. Micou irresponsibly placed himself in a situation where he experienced drowsiness, loss of alertness, inattention, and a microsleep which caused him to fall asleep for a short time just prior to the crash; and that the crash could have been avoided if Mr. Micou had properly complied with the Hours of Service regulations, managed his sleep, work-rest scheduling, and took rest-breaks from driving."

Id. The court held that based upon the SALT report and the opinions of the driver fatigue expert, "genuine issues of material fact exist[ed] as to whether Defendants' conduct was so outrageous as to warrant an award of punitive damages." Came, 2005 WL 1500978, at *5.

The evidence presented with respect to Matheney's conduct in this case is distinguishable from the conduct of the truck driver in Came. Rubino's suggestion that Matheney was either inattentive, distracted or fatigued and the lack of testimony with respect to which one it was stands in stark contrast to the expert reports submitted by the plaintiff in Came. The experts who prepared those reports relied upon the truck driver in that case being "on duty for at least 75.5 hours in the eight days prior to and including the day of the collision" to conclude that the truck driver fell asleep while operating his vehicle. Id. Those reports, if believed by the jury in that case, would support a jury's finding that the truck driver acted in reckless indifference to the safety of others because after driving 75.5 hours in the past eight days, he would have a subjective appreciation that he may be fatigued and by driving his truck, he was placing those

around him in risk of harm. Here, the opinion of Rubino, who was not an expert in driver fatigue, did not suffice to create a genuine dispute of material fact with respect to whether Matheney acted outrageously in causing P. Keifer's injuries because there was no evidence that Matheney felt tired, was not well-rested, or had any other reason to believe driving the night of the accident placed P. Keifer in risk of harm. Under those circumstances and unlike the situation in <u>Came</u>, there was no genuine dispute of material fact in this case with respect to whether the Keifers were entitled to punitive damages.

The other decisions cited by the Keifers are likewise distinguishable because the evidence adduced or the allegations made in those decisions support a reasonable finding that the defendant truck drivers had a subjective appreciation of the risk of harm caused by their conduct. <u>See</u> <u>Sabo v. Suarez</u>, Civ. No. 08-1889, 2009 WL 2365969, at *2 (M.D. Pa. July 31, 2009) (permitting discovery with respect to the plaintiff's claim for punitive damages when there was evidence the defendant truck driver drove through a red light when "the weather was wet and foggy and visibility was poor"); <u>Esteras v. TRW Inc.</u>, Civ. No. 03-1906, 2006 WL 2474049, at *5 (M.D. Pa. Aug. 25, 2006) (holding a genuine dispute of material fact existed with respect to whether the defendant truck company and defendant truck driver acted with reckless indifference to the safety of the general public by failing to ensure the safety of their vehicles); <u>Shafer v. Wickham</u>, Civ. No. 97-6886, 1999 WL 961273, at *2 (E.D. Pa. Oct. 15, 1999) (holding a genuine dispute of material fact existed with respect to whether the defendant truck driver acted with reckless indifference to the safety of others by failing to inspect his tractor trailer when he had reason to know it might be defective and unsafe); <u>Logue v. Logano Trucking Co.</u>, 921 F.Supp. 1425, 1428 (E.D. Pa. 1996) (denying a motion to dismiss a claim for punitive damages where the plaintiff alleged the defendant truck driver "operated an overloaded tractor trailer truck

with improperly adjusted brakes at an excessive, unreasonable and imprudent rate of speed so that the truck could not stop for a red light").

Based upon the foregoing discussion, the Keifers' post-trial motion filed pursuant to Rule 59 must be denied. The evidence presented at trial did not create a genuine dispute of material fact with respect to Matheney's conduct that would support a finding that he had a subjective appreciation of the risk of harm caused by his actions and that he acted in conscious disregard of that risk. Under those circumstances, a reasonable jury could not find Matheney's conduct was so outrageous that the Keifers were entitled to punitive damages from Matheney or from Reinhart based upon a theory of vicarious liability.

## IV.    Order

**AND NOW,** this 11th day of June, 2013, for the reasons set forth above, the post-trial motions filed by Balthazar and Werner and Matheney and Reinhart (ECF Nos. 323, 325) are **GRANTED IN PART** with respect to the award of $45,000 for future medical expenses and **DENIED IN PART** with respect to the award of $325,000 for loss of future earnings. The monetary judgment in favor of P. Keifer shall be amended to exclude the award of $45,000 for future medical expenses. The motion for leave to file post-trial motions (ECF No. 324) filed by Balthazar and Werner will be **DENIED** as **MOOT**.

**IT IS FUTHER ORDERED** that the post-trial motion filed by the Keifers (ECF No. 354) is **DENIED**.

The parties are **HEREBY ORDERED** to meet and confer to recalculate delay damages in light of the court amending the judgment to exclude the award of $45,000 for future medical expenses and the other modifications required by the court's order dated April 10, 2013. The

parties shall file with the court a joint proposed form of amended judgment on or before the 21st

of June, 2013.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge